UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF IDAHO

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>         Plaintiff,<br>v.<br><br>AMANDA RENEE ATENCIO,<br><br>         Defendant. | Case No. 1:21-cr-0058-DCN<br><br>**MEMORANDUM DECISION AND ORDER** |

## I. INTRODUCTION

Pending before the Court are Defendant Amanda Renee Atencio's Motion to Suppress Statement (Dkt. 21) and Motion to Suppress Fruits of Unlawful Search of Home (Dkt. 36). The Court held an evidentiary hearing on the Motions on February 1, 2022, and took the matters under advisement.

For the reasons set forth below, the Motion to Suppress Statement and Motion to Suppress Fruits of Unlawful Search of Home are **GRANTED**.

## II. BACKGROUND

### A. Factual Background

*1. The Nampa Riot*

On July 5, 2020, the Nampa Police Department ("NPD") received a call to dispatch reporting an altercation involving shots fired at a Nampa residence located on 2nd Avenue North ("Nampa residence"). According to NPD Detective Matthew Richardson, Northside gang members began fighting at the Nampa residence after a minor victim who lived there

told them they had to leave. The minor victim reported the gang members came to her home after they left a party in Caldwell that was broken up by law enforcement. When the individuals arrived at the Nampa residence, the minor victim was jumped by female Northside gang members, including by Defendant Amanda Renee Atencio's ("Atencio") fifteen-year-old daughter, Maricela Martinez ("Maricela"). During the altercation, an adult male came outside to attempt to break up the fight. He was hit in the head with a beer bottle, causing him to bleed near his left eyebrow. Additional victims were also injured.

After the initial fight, the group of Northside gang members left the Nampa residence but returned approximately 20-30 minutes later. Two adult males—including the victim who had been hit in the head with a beer bottle—were outside at the time. The Northside gang members began fighting with the two men, and stabbed one of the men in the chest. A male Northside gang member then pulled out a firearm and began shooting. After the gun was fired, the Northside gang members ran to their vehicles and fled the scene.

Following a call reporting "shots fired" at the Nampa residence, NPD Officers were dispatched to the Nampa residence. The NPD Officers detained a male identified as Gabriel "RJ" Bernal, who was observed running from the scene of the shooting to a vehicle driven by another individual. During a subsequent interview, Bernal informed NPD Officers that he went to the Nampa residence because someone there had a "beef" with his brother Isaac

Bernal. Dkt. 21-2, at 3.[1] The NPD Officers recovered empty shell casings just south of the Nampa residence. One officer also recovered a red bandana, which, in his search warrant affidavit, Richardson noted is associated with the Northside gang. *Id.*

*2. The Search Warrant*

Seven weeks later, on August 24, 2020, Richardson submitted an affidavit seeking a warrant to search Maricela's suspected residence. In his affidavit, Richardson stated there was "probable cause that Gabriel 'RJ' Bernal [] committed the crime of Felony Rioting with Felony Gang Enhancement [Idaho Code section] 18-8502," and that evidence of this crime could be found in Maricela's home. *Id.* at 2. The affidavit stated in-house police department and school records confirmed Maricela resided at 611 16th Avenue North. Nampa, Idaho ("611 16th Avenue North"). *Id.* Atencio was not the subject of the search; rather, the warrant was sought in order to obtain evidence regarding Maricela's involvement in the Nampa riot. Richardson's affidavit noted, "Maricela Martinez was identified associating with known Northside gang members during a fight that resulted in shots being fired." *Id*. at 5. Under the "Items to Be Seized" portion, Richardson's affidavit identified: (1) evidence which would show occupancy, ownership and/or control of 611 16th Avenue North; (2) guns and ammunition; (3) gang indicia; and (4) all digital evidence, including cell phones, computers, tablets, and any other electronic devices. *Id*. at 6.

---

[1] All page citations are to the ECF-generated page number.

Richardson used much of the same affidavit to obtain seven additional warrants to search the homes of other suspects of the Nampa riot. Dkt. 36-1, at 5; Dkt. 36-3.

On August 24, 2020, Idaho Third Judicial District Magistrate Judge Debra Orr issued search warrant #5485 for the search of 611 16th Avenue North. Dkt. 21-3. Judge Orr issued the warrant based on her conclusion that Richardson's affidavit established "certain evidence of the crimes of Rioting with felony gang enhancement" could potentially be found in the home. *Id*. The warrant authorized the police to search 611 16th Avenue North for, and to seize, any of the above-described items. *Id.* The search warrant also authorized law enforcement to remove such items from the home and to conduct a forensic search of the entire contents of any seized cell phones and/or other electronic devices. *Id*.

### 3. The Search

On August 26, 2020, numerous NPD officers converged upon 611 16th Avenue North at approximately 6:30 in the morning. Documents provided by the Government in discovery indicate seven officers were assigned to the "search team," two additional investigators were present to collect evidence and photograph the residence, and another two responding officers, including Richardson, were present for, or assisted with, the search. Dkt. 21-5; Dkt. 21-6.

In his report, NPD Officer Joel Woodward indicated he "was assigned as a part of the home entry team and to search the residence." Dkt. 21-4, at 1. When Woodward and the other officers arrived at 611 16th Avenue North, they approached the front door and

announced, "Nampa Police, search warrant." *Id*. The officers heard a dog barking and movement inside the home. Shortly thereafter, a male identified as Victor Martinez Sr. ("Victor Sr.") opened the front door. As the door opened, Woodward saw Victor Sr. and a juvenile identified as Isaac Martinez standing in the living room of the residence. Officer Woodward "began giving the two males commands to put their hands above their heads." *Id*. Although Victor Sr. was "compliant," Woodward "put hands" on Victor Sr. and passed him along to the officers behind him. Dkt. 46, at 9:13–17, 46:23–25; 47:1–2. Woodward did not see what happened to Victor Sr. next. *Id.* at 47:3–4.

Woodward also witnessed Maricela and Atencio exit a hallway on the north side of the home. Woodward told Maricela and Atencio to stop, but Atencio "disobeyed" his command and walked quickly into the kitchen area, where Woodward lost sight of her. Dkt. 21-4, at 1. A few seconds later, Atencio exited the kitchen and approached the front door. Woodward commanded Atencio, Maricela, and Isaac to go outside. Dkt. 46, at 11:21–25.

Woodward and the other officers then entered the residence and started searching for additional occupants. They located Alicia Martinez, Atencio's twelve-year-old daughter, and Lorri Atencio, Atencio's mother, asleep inside their bedrooms in the basement. Woodward "stood Alicia up from her bed and walked her outside of the home, via the basement door entrance." Dkt. 21-4, at 1. Shortly thereafter, all six occupants of the home were directed to move back inside and to sit in the living room while the officers searched the home. Woodward noted in his report: "After all occupants of the home were

detained, I began searching the residence." *Id*. At some point during the search, officers allowed Atencio to get a drink from the kitchen. Atencio had to ask permission to leave the living room, and was supervised by officers while she retrieved a glass of water. Dkt. 46 at 33:3–16, 52:1-15. When Atencio did so, Woodward saw her pick up an empty cake tray and stuff it into the kitchen garbage can. *Id.* at 16:3–9.

Woodward started his search with the upstairs northeast bedroom of the home, which he believed to be Maricela's due to a photograph of her located in the room. Woodward photographed and seized a cell phone and charger block located inside the bedroom. Woodward then searched a "small cabinet area" and found a bin containing "several empty articles of marijuana containers and rolling papers," as well as "small amounts of a green leafy substance . . . presumed to be marijuana." Dkt. 21-4, at 1. Because he understood the search warrant "did not cover searching for drugs," Woodward spoke to Atencio and confronted her with the drug-related items he had found in Maricela's bedroom. *Id*. at 1–2. Woodward explained that the search warrant did not authorize the police to search for drugs, and asked Atencio to consent to the search of her home for drugs. Atencio agreed and signed a written consent to search form. Woodward then continued to search Maricela's bedroom and located a few more items of marijuana paraphernalia.

After completing his search of Maricela's bedroom, Woodward began assisting other officers with the search of the northwest bedroom, which appeared to belong to Atencio based on adult female clothing located there. Woodward found and seized a cell phone and electronic tablet near the foot of Atencio's bed. The NPD Officers ultimately

seized at least fifteen cell phones, a tablet, a Sony camera, and a laptop computer from the home. To date, none of these cell phones or other devices have been returned to Atencio or to her family.

As he was conducting the search of Atencio's bedroom, Woodward was contacted by another member of the search team, Officer Davis. Davis reported that he had located a loaded .40 caliber pistol with a magazine containing thirteen rounds of ammunition in the kitchen garbage can. *Id.* at 2. Because he suspected Atencio had placed the firearm in the garbage can, Woodward separated Atencio from her family members in order to question her. Woodward led Atencio to the back porch, where she was detained, but was not handcuffed. Dkt. 28, at 5; Dkt. 46, at 57:1–17.

*4. The Confession*

Through the discovery process, the Government disclosed a video recording of Woodward's subsequent encounter with Atencio. Dkt. 21-7. No other officers were present during the questioning. At the outset of the recording, Woodward disclaimed any involvement in the underlying situation involving Maricela, and stated his only role in the investigation was as an entry and search team member for 611 16th Avenue North. *Id.* at :05-:20. Woodward described what he was authorized to search for based on the search warrant and Atencio's consent. *Id.* at :24-:33. He proceeded to tell Atencio that he did not locate any additional unlawful drugs, but that he did find something that concerned him and needed to talk to her about. *Id.* at :38-:51. Woodward then advised Atencio of her *Miranda* rights. He did not follow a script, but instead recited the warnings from memory.

Dkt. 46, at 57:4–6. Woodward next stated, "the reason those haven't been read to you before is you have been detained here, but I don't think anyone has asked you any incriminating questions, correct me if I'm wrong." Dkt. 21-7, at 1:20-1:28. Atencio shook her head to indicate that she had not been questioned, and Woodward asked her if she was willing to talk to him. *Id*. at 1:29-1:31. Atencio responded affirmatively. *Id*.

Once she agreed to talk to him, Woodward immediately told Atencio he believed she had put the firearm in the garbage can in the kitchen because she did not pay attention to his commands when he entered the home, and had instead walked into the kitchen. *Id*. at 1:32-1:38. Woodward explained that when he later "let" Atencio go into the kitchen area to get water, she grabbed a cake tray, put it in the garbage can, and stuffed it down. *Id*. Atencio responded that she only momentarily failed to respond to Woodward's commands because she was going to get her kids. She also denied hiding the gun in the trash, explaining she was embarrassed her home was messy and was just trying to clean up. Atencio stated one of her sons had come over earlier to drop the dog off and might be responsible for the gun. *Id*. at 1:39-2:33. Woodward responded that he was not saying the gun belonged to Atencio, but emphasized he needed to know if she knew about the gun or had moved it into the trash. *Id*. at 2:39-2:50.

Atencio continued to deny both putting the gun in the trash and knowing there was a gun in her home. Woodward then advised Atencio that officers had located a box for the gun in the basement. *Id*. at 3:11–3:23. When she again denied knowing about or possessing the gun, Woodward ultimately warned Atencio he did not believe her and was looking for

a level of cooperation. He stated that because the initial investigation was gang-related, the gun would be sent off for fingerprint testing and "touch DNA," which would reveal whether Atencio had handled the gun and lied to him. *Id*. at 3:53-4:35. Woodward asked Atencio to think about how it would look going forward if such information was put in a police report. *Id*.

Atencio then confessed that the gun belonged to her stepson, Victor Martinez Jr. ("Victor Jr."), and that she had hidden the gun in her room because Victor Jr. had left the gun in her little boy's room. Atencio also stated she had been hiding the gun in her room since the day before because she had asked Victor Jr. to come get the gun but he had not. *Id*. at 4:35-5:10. Finally, Atencio admitted she had the gun when she left her bedroom and that she put it in the kitchen garbage can. *Id*. at 4:36-5:25. Atencio explained she lied to Woodward initially because she did not want to get Victor Jr. in trouble. She also confirmed she is a convicted felon prohibited from possessing a gun. *Id*. at 5:28-5:55.

Woodward told Atencio that she might be arrested, but stated he would tell the case detective she had initially denied, but ultimately admitted, her possession of the gun. At the end of the encounter, Woodward told Atencio she could go back into the living room. *Id*. at 8:29-8:34. Officers thereafter continued to search the home until approximately 3:30 p.m.—nine hours after they arrived at 611 16th Avenue North to initiate the search. Dkt. 46, at 52:10–15. At some point during the search, Atencio was arrested and transported to jail by one of the NPD Officers.

### B.    Procedural Background

On February 11, 2021, Atencio was indicted by a federal grand jury and charged with Unlawful Possession of a Firearm under 18 U.S.C. § 922(g)(1). Atencio filed her Motion to Suppress Statement on July 26, 2021 (Dkt. 21), and her Motion to Suppress Fruits of Unlawful Search of Home on October 9, 2021 (Dkt. 36). After several continuances due to Covid-19 and other unforeseen circumstances, the Court held an evidentiary hearing on February 1, 2022.

During the evidentiary hearing, the Government called Woodward as a witness and the defense called Maricela. At the conclusion of the hearing, the Court ordered the parties to submit their closing arguments via simultaneous closing briefs. The briefs were submitted, and the matter became ripe for review, on February 24, 2022.[2]

## III. ANALYSIS

In her Motion to Suppress Statement, Atencio argues her confession should be suppressed because Woodward subjected her to a custodial interrogation without providing adequate *Miranda* warnings.

In her Motion to Suppress Fruits of Unlawful Search of Home, Atencio contends: (1) the search warrant affidavit failed to establish probable cause to believe that the items sought could be found in 611 16th Avenue North; (2) the warrant failed to satisfy the Fourth Amendment's particularity requirement; and (3) the search warrant was overbroad in

---

[2] Defense counsel submitted both his closing brief, and his reply in support of the closing brief, in the early morning hours of the day following the Court's briefing deadlines. Defense counsel informally certified that he had not reviewed the Government's briefing prior to filing in order to preserve the simultaneous nature of the closing briefs. The Government did not object to the tardy filings.

permitting the seizure and forensic search of all cell phones and other electronic devices, regardless of whether or not such devices had any connection to Maricela. Since the search warrant was purportedly unjustified in its authorization of the intrusion into her home, Atencio suggests the Court should exclude all fruits of the unlawful search, including the firearm that is the basis of the sole charge against her.

Because there are two pending Motions to Suppress in this case, with different applicable legal standards, the Court sets forth the appropriate legal standard with respect to each Motion.

**A**. **Motion to Suppress Statement (Dkt. 21)**

*1. Legal Standard*

The Fifth Amendment provides "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 479 (1966), the Supreme Court held the Fifth Amendment's prohibition against compelled self-incrimination requires that a criminal defendant must be advised: (1) he has the right to remain silent; (2) anything he says can be used against him in a court of law; (3) he has the right to the presence of an attorney; and (4) if he cannot afford an attorney one will be appointed for him prior to questioning if he so chooses. With respect to the right to an attorney, a criminal defendant must be warned she has the right to consult with counsel both before and during questioning. *People of Territory of Guam v. Snaer*, 758 F.2d 1341, 1342–43 (9th Cir. 1985) ("*Snaer*"); *Duckworth v. Eagan*, 492 U.S. 195, 204 (1989).

While the Supreme Court does not require a "verbatim recital of the words of the *Miranda* opinion," the warning must reasonably convey to a suspect his rights as required by *Miranda*. *California v. Prysock*, 453 U.S. 355, 359–60 (1981). When a suspect is subjected to a custodial interrogation without first being advised of her rights, "*Miranda* dictates that the answers received be presumed compelled and that they be excluded from evidence at trial in the State's case in chief." *Oregon v. Elstad*, 470 U.S. 298, 317 (1985).

*2. Analysis*

The parties dispute both whether Atencio was in custody at the time of Woodward's questioning, and, if she was, whether Woodward's *Miranda* warnings were sufficient to advise Atencio of her Fifth Amendment rights.[3]

a. Custody

A police officer is required to provide *Miranda* warnings when a defendant has been taken into custody or is otherwise deprived of his freedom of action in a significant way. *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). To determine whether Atencio was in custody, the Court objectively considers the totality of the circumstances surrounding the interrogation and assesses whether, given such circumstances, a reasonable person would "have felt he or she was not at liberty to terminate the interrogation and leave." *Thompson v. Keohane*, 516 U.S. 99, 112 (1995). Where, as here, the Court must apply *Miranda* "to

---

[3] The parties do not address, and thus appear to agree, that Woodward's questioning constituted an interrogation. The Court finds Woodward's extensive and specific questioning was "reasonably likely to elicit an incriminating response from the suspect," and was thus an interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980).

the task of sorting a non-custodial in-home interrogation from a custodial one," the Court's analysis "considers the extent to which the circumstances of the interrogation turned the otherwise comfortable and familiar surroundings of the home into a 'police-dominated atmosphere.'" *United States v. Craighead*, 539 F.3d 1073, 1083 (9th Cir. 2008).

The following factors are among those likely to be relevant in deciding whether a reasonable person would have felt free to terminate an interrogation: "(1) the language used to summon the individual; (2) the extent to which the defendant is confronted with evidence of guilt; (3) the physical surroundings of the interrogation; (4) the duration of the detention; and (5) the degree of pressure applied to detain the individual." *United States v. Kim*, 292 F.3d 969, 974 (9th Cir. 2002) (cleaned up). Additional relevant factors may include the number of law enforcement personnel present and whether they were armed, whether the suspect was restrained or isolated from others, and whether the suspect was informed that she was free to leave or terminate the interview and the context in which any such statements were made. *Craighead*, 539 F.3d at 1084. "Other factors may also be pertinent to, and even dispositive of, the ultimate determination whether a reasonable person would have believed he could freely walk away from the interrogators"; the aforementioned factors are simply "ones that recur frequently." *Kim*, 292 F.3d at 974.

After carefully considering the record and the testimony during the evidentiary hearing, as well as the aforementioned factors, the Court concludes Atencio was subjected to a custodial interrogation.

*i. Language Used to Summon the Individual*

When an individual voluntarily approaches officers with the understanding that he will be questioned, the Supreme Court has concluded the individual is not in custody. *California v. Beheler*, 463 U.S. 1121, 1125 (1983); *Mathiason*, 429 U.S. at 495 (holding the defendant was not in custody when he arrived at the police station voluntarily and was allowed to leave after thirty minutes of questioning); *see also Kim*, 292 F.3d at 974–75 ("If the police ask—not order—someone to speak to them and that person comes to the police station, voluntarily, precisely to do so, the individual is likely to expect that he can end the encounter.").

There is a critical distinction, however, between voluntarily arriving at a station for questioning, and responding to a police officer's order while, in Woodward's own words, being "detained" in one's home. Dkt. 21-4, at 1; Dkt. 21-7, at 1:20-1:28; Dkt. 46, at 57:1–17. Here, Atencio did not voluntarily submit to an encounter with police. Rather, she was awakened at 6:30 a.m. by approximately eleven armed police officers with a warrant to search her home. After knocking on Atencio's door, officers directed Atencio's husband and son to put their hands on their heads. Dkt. 21-4, at 1. Atencio and her family, including Atencio's elderly mother and three minor children, were thereafter "detained" in the living room for approximately nine hours while the officers searched the home. *Id*.; Dkt. 46, at 52:1-15, 57:1–17. Officers continued to search the home before, during, and after Atencio's encounter with Woodward. Moreover, Atencio was not permitted to leave the premises after she was questioned, but was instead ultimately arrested and transported to the police

station. *Craighead*, 539 F.3d at 1084 n. 3 (noting the arrest of a suspect following the termination of questioning is another indicator of custody).

While an individual who voluntarily travels to a police station with the understanding that she will be questioned may expect she can end the encounter, the same cannot be said for an individual unexpectedly detained with her family for hours while her home is searched. *Id.* at 1083. This is particularly apparent where, as here, a suspect is isolated from family members during an interrogation. *Kim*, 292 F.3d at 975 (finding suspect was not likely to expect she could end the encounter where, *inter alia*, she was isolated from two other family members and then questioned).

Further, Woodward's affidavit does not indicate that he "asked" Atencio to accompany him outside; his affidavit is entirely silent on this issue. Dkt. 21-4. Woodward testified during the evidentiary hearing that, to summon Atencio outside, he stated something to the effect of "Hey Amanda . . . . Can I talk to you on the back patio?" Dkt. 46, at 17:18–21. Woodward contended he made a "request" and did not direct Atencio to follow him outside. *Id.* at 17:24–25. However, Maricela's testimony during the evidentiary hearing—which was unrefuted by Woodward—vividly illustrated a reasonable person would not feel they had any choice but to follow Woodward outside, regardless of the language he purportedly used to summon Atencio.[4]

---

[4] The Court uses the term "purportedly" not to undermine Woodward's veracity, but rather because he could not recall, or was unaware of, many significant details regarding the search during the hearing, such as how many officers were on the search team, whether the officers conducting the search were armed with handguns or assault rifles, whether the officers had their weapons drawn or holstered, whether or not the (Continued)

Specifically, Maricela testified her family was awakened by officers banging on the front door and yelling. *Id.* at 77:6–18, 79:1–23. When Maricela's father, Victor Sr., answered the front door, two or three officers grabbed him and threw him down the front steps onto the grass outside the home. *Id.* at 80:9–17. Maricela testified that at least one of the officers was wearing a ski mask, and that the officers had "really big . . . long guns . . . tucked under their arm[s]." *Id.* at 81:5–25, 82:1–7. Maricela confirmed all of the officers were carrying guns that were "too big to have them put away." *Id.* at 82:5–10.

After the officers threw Victor Sr. down the front steps, Maricela started screaming because the officers were "throwing" her father and she couldn't understand why. *Id.* at 80:14–17. When Victor Sr. fell to the ground, the officers restrained him in metal handcuffs. *Id.* at 82:13–21. Maricela testified that Victor Sr. did not resist the officers in any way, and that he instead kept telling her to stop screaming, to listen to the police officers, and to walk outside.[5] *Id.* at 81:2–4, 82:22–23, 83:3–5. Once Victor Sr. was handcuffed, the officers asked Maricela's mom (Atencio) if there was anyone else in the house. *Id.* at 83:12–15. Atencio responded that her mother and younger daughter were asleep downstairs in the basement. *Id.* Officers then proceeded downstairs and started

---

other officers were wearing masks or body armor, whether any officers provided Atencio with a copy of the warrant, or whether any cell phones were seized in the search, Dkt. 46 at 31:20–25, 32:1–5, 40:10–15, 41:4–9, 44:1–21, 45:11–17, 63:16–18. Given such lapses in Woodward's memory and/or knowledge regarding the details of the search, the Court finds it difficult to accept his testimony regarding the specific words he used to "request" that Atencio to accompany him outside. *Id.* at 17:24–25.

[5] Woodward confirmed Victor Sr. was "compliant" when the officers encountered him. *Id.* at 9:14–17; Dkt. 21-4, at 1. Nevertheless, Woodward testified he "put hands" on Victor Sr., "passed him along" to another officer, and was unaware of what happened to Victor Sr. next. Dkt. 46, at 46:23–25, 47:1–24, 53:13–17.

"screaming" at Atencio's mother and twelve-year-old daughter to put their hands up. *Id.* at 83:18–23. Atencio's mother and daughter still had their hands raised in the air when the officers led them outside. *Id.* at 85:1–3. Maricela testified the officers were "very aggressive and demanding," and that she did not feel she had any choice but to obey their commands. *Id.* at 84:7–8.

After all of the family members had been led outside, officers directed them back inside and told them to sit in chairs the officers had arranged in the living room. *Id.* at 86:4–23. Maricela testified she and her family members were not allowed to leave the living room. *Id.* at 87:3–8. Woodward confirmed that Atencio and her family members were detained in the living room, were not allowed to "roam freely" in the home, and that an officer stood "watching them" in the living room while the home was searched. *Id.* at 9–21. In fact, Maricela—who was only fifteen at the time of the search—testified she had covered herself with a blanket, but had not had time to get dressed before the officers entered her home. *Id.* at 79:19–23, 80:21–24. Once the family was taken back inside the home, Maricela asked if she could get a shirt but was not allowed to go to her bedroom. *Id.* at 87:24–25, 88:1–18. Understandably, Maricela stated she did not feel like she had any freedom in her home. *Id.*

Eventually, Maricela's school resource officer, NPD Officer Tlucek, arrived at the home and allowed Maricela to retrieve a shirt. *Id.* at 88:21–25. Tlucek accompanied Maricela into her room and, once she was dressed, told Maricela to return to her chair in the living room. *Id.* at 89:4–5. Once Maricela returned to her chair, Tlucek told Maricela

to stand up and put her hands behind her back. *Id.* at :13–15. Tlucek proceeded to handcuff Maricela—in front of Atencio and the others—with metal handcuffs. *Id.* at :19–25, 91:1–2. Maricela testified her family members "looked very scared," "shocked," and "confused" when she was handcuffed. *Id.* at 91:9–19. Maricela was then arrested and taken to the Nampa Police Department. *Id.*

Despite having witnessed both her husband and minor daughter in handcuffs, and her daughter arrested and taken away, the Government suggests Atencio "voluntarily" followed Woodward to the back patio upon his "request." Dkt. 48, at 3. The Government argues that although Atencio was "out of view and earshot of her family, she was in a familiar setting and would undoubtedly be comfortable in knowing her family was close by." *Id.* It strains credulity to suggest Atencio was "comfortable" in the midst of the approximately eleven armed officers who had just roughed up and handcuffed her husband, handcuffed and arrested her minor daughter, and escorted her other minor children and elderly mother outside with their hands raised above their heads.

As the Ninth Circuit has held, "the presence of a large number of visibly armed law enforcement officers goes a long way towards making the suspect's home a police-dominated atmosphere." *Craighead*, 539 F.3d at 1085. Moreover, Woodward confirmed that none of his commands were optional, that Atencio and her family members were "detained" and guarded for the entirety of the approximately nine-hour search, that he took Atencio outside so she would "not be influenced by anyone else," and that he specifically

told Atencio she was "detained" prior to questioning her. Dkt. 46, at 15:9–21, 20:1–2, 25:22–24, 32:23–25, 33:1–16, 47:9–18, 52:1–15, 57:1–3.

In sum, a reasonable person would not feel she could refuse Woodward's "request" to accompany him outside, and this factor weighs in favor of finding Atencio was in custody at the time of her interrogation.

### ii. Confrontation with Evidence of Guilt

A finding that law enforcement confronted a suspect with evidence of his guilt suggests the suspect was in custody. *Kim*, 292 F.3d at 974; *United States v. Lee*, 699 F.2d 466, 468 (9th Cir. 1982) (holding a suspect was in custody where agents allowed him "to repeat his exculpatory story" and then "confronted him with evidence of his guilt."). After giving Atencio her *Miranda* warnings, Woodward immediately advised Atencio he believed she put the handgun in the trash can in the kitchen for two reasons: (1) because she did not respond to his commands when officers first opened the door to her home, and instead walked into the kitchen; and (2) because when he later "let" Atencio go into the kitchen to get a glass of water, she stuffed a cake tray into the garbage can. Dkt. 21-7, at 1:32–1:38.

The Government suggests Woodward did not confront Atencio with evidence of her guilt because he was "only acting upon his hunch that Defendant was the one to place the handgun in the trash" and that his questions were merely "an effort to clarify his suspicions, not to ambush the Defendant with definitive evidence of guilt." Dkt. 28, at 9. Yet, Woodward did not simply confront Atencio with his suspicions, but instead stated, "I think

you put it [the gun] there [in the trashcan] and here's why…." Dkt. 21-7, at 1:35–1:37. As Atencio highlights, the Government has not cited any authority to suggest there is a distinction between confronting a suspect with an officer's suspicions—based on the suspect's observed actions—rather than with direct evidence of guilt. Dkt. 30, at 8–9. A reasonable person, upon being confronted with Woodward's "hunch" regarding the firearm would not attribute any significance to the distinction the Government urges the Court to accept. Dkt. 28, at 9.

Further, when she denied knowing about the gun, Woodward confronted Atencio with additional evidence to suggest she was lying—telling her officers had located a box for the gun in the basement. Dkt. 21-7, at 2:30. After Atencio continued to deny knowing about the gun, Woodward stated "I have to know your level of involvement" in putting the gun in the trashcan. *Id*. at 2:42–2:50. When she did not confess, Woodward warned Atencio the firearm would be fingerprinted and DNA tested, and if the testing positively linked her to the gun, "that is going to tell me . . . you were lying to me . . . . And that's all going to go in the police report, and how is that going to look going forward? I want you to think of that." *Id*. at 4:22–5:35. During the evidentiary hearing, Woodward confirmed that he did not accept Atencio's denials, that he told Atencio he knew she was prohibited from possessing a firearm, and that he warned Atencio she would face legal consequences if lab results showed that she had handled the gun. Dkt. 46, at 59:11–25, 60:1–20.

By essentially insisting upon Atencio's guilt until she confessed, Woodward established a setting from which a reasonable person would not believe she was free to

leave. *United States v. Beraun-Panez*, 812 F.2d 578, 580 (9th Cir. 1987) (holding a reasonable person would not believe he was free to leave when, among other things, officers accused him of lying and insisted on the "truth" until the suspect told them the information they sought). In fact, Woodward confirmed during the evidentiary hearing that Atencio was not free to leave during the interrogation and that he would have stopped her if she had tried to run. Dkt. 46, at 57:15–17.

Although his interrogation was brief, Woodward's "relentlessness gave rise to a psychological coercion beyond that inherent in a typical noncustodial interrogation." *Beraun-Panez*, 812 F.2d at 580 (citations omitted). As such, this factor weighs in favor of finding Atencio was in custody.

### iii. Physical surroundings of Interrogation

Citing *Michigan v. Summers*, 452 U.S. 692 (1981) ("*Summers*") and *United States v. Eide*, 875 F.2d 1429, 1437 (9th Cir. 1989), the Government argues Atencio's physical surroundings were substantially less intrusive than an arrest because she was in her home, and not at the police station, during the interrogation. Dkt. 28, at 9. In *Summers*, the Supreme Court held a suspect's detention by police at his home during the execution of a search warrant did not constitute an unreasonable seizure under the Fourth Amendment. *Summers*, 452 U.S. at 701–02. The Government's reliance on *Summers* is misplaced because the Ninth Circuit has expressly explained that whether an individual has been unreasonably seized under the Fourth Amendment is a different issue than whether an individual is "in custody" for *Miranda* purposes. *Kim*, 292 F.3d at 976. Significantly, the

*Kim* court also noted that if the suspect in *Summers* had been interrogated during his home detention, he would have been entitled to *Miranda* warnings. *Id*.

The Ninth Circuit's holding in *Eide* is also inapposite. In that case, a pharmacist ("Eide") employed by the Veterans Administration Medical Center ("VAMC") was taken to the emergency room after being found in his car with needles, drugs, and syringes. *Eide*, 875 F.2d at 1431. The police called Eide's supervisor at the VAMC, and gave the supervisor the option of having Eide arrested or letting the VAMC handle the matter internally. *Id*. The supervisor chose the latter and Eide was transported to the VAMC. While being treated at the VAMC, Eide consented to a urinalysis which revealed the presence of methadone, morphine, and Darvon. *Id*.

Approximately a week later, an audit at the VAMC pharmacy uncovered that someone had tampered with the pharmacy's supply of methadone and morphine. *Id*. at 1432. The VAMC notified the FBI of the audit and of Eide's potential involvement. FBI agents subsequently went to Eide's home to interview him. All witnesses—including Eide and his wife—agreed that the atmosphere of the meeting was amicable. *Id*. The FBI agents did not search Eide's home and Eide was not arrested following the ninety-minute interview. The Ninth Circuit rejected Eide's claim that the FBI agents were required to give him *Miranda* warnings prior to the interview, explaining "Eide was not in custody and in fact was never arrested for these crimes. . . . Particularly because the FBI agents interviewed Eide at his home, and also because the meeting was amicable, the district court's conclusion that *Miranda* warnings were not required is affirmed." *Id*. at 1437.

The situation in *Eide* is entirely distinguishable from that here. The FBI agents in Eide were not executing a search warrant, and their interview of Eide was, by all accounts, entirely amicable. Eide was not detained and he was not isolated from his wife during the interview. Nor was Eide arrested when the interview concluded after ninety-minutes. By contrast, Atencio was awakened in the early morning hours by multiple armed officers, at least one of whom was wearing a ski mask, with a warrant to search her home. She and her family members were detained for approximately nine hours, and during this time Atencio was isolated and taken outside for questioning. In addition to witnessing her husband in handcuffs and her minor daughter's arrest shortly before she was questioned, Atencio was also arrested and transported to the police station following Woodward's interrogation.

In short, while the fact that an interrogation is conducted in a suspect's home may, under some circumstances, suggest a suspect was not in custody, here the specific circumstances of Atencio's interrogation show otherwise. The physical surroundings of the interrogation weigh in favor of finding Atencio was in custody.

### iv. Duration of the Interrogation

Atencio's questioning was less than nine minutes. The Government argues this short duration weighs against finding Atencio was in custody. Yet, despite the short duration of the interrogation, Atencio was nevertheless detained for hours before and after the interrogation. As such, the Court finds the short duration of the interrogation does not suggest Atencio was free to leave or terminate the interview. *Craighead*, 539 F.3d at 1083 (explaining a suspect "may not feel that he can successfully terminate the interrogation if

he knows that he cannot empty his home of his interrogators until they have completed their search").

### v. Degree of Pressure

In its closing brief, the Government suggests "[a]t no time before or during the interview was [Atencio] placed in handcuffs or otherwise physically restrained" and, "although she was detained during the execution of the search warrant, there were no other forms of pressure applied to restrain [Atencio]." Dkt. 48, at 4. This argument ignores the extreme emotional pressure Atencio faced when her husband was thrown down the stairs and handcuffed, her fifteen-year-old daughter was handcuffed and taken away, her elderly mother and other minor daughter were ordered from their beds by armed officers, and her entire family was detained and guarded for hours while their home was searched—not to mention the psychological pressure Atencio must have felt by being subjected to such conditions herself. The Government's argument that Atencio was not handcuffed during the interrogation is a non-starter in light of the highly coercive environment she experienced.

The Government also suggests the degree of pressure used to detain Atencio was minimal because Woodward was the sole detective present at the time of the interrogation. This contention ignores that approximately ten other armed police officers continued to search Atencio's small home while she was interrogated. Further, Atencio and her family members were escorted by officers and observed at all times if they needed to use the restroom or otherwise leave the living room. Dkt. 46, at 88:14–18. When Atencio asked if

she could have a drink, Woodward confirmed that she was escorted to and from the kitchen, and was also supervised while she retrieved a glass of water.[6] *Id.* at 15:20–25, 16:1–9. Restraint amounting to custody may be inferred "where law enforcement officers permit the suspect to move around the house for brief periods but insist on escorting and monitoring him at all times." *Craighead*, 539 F.3d at 1085–86.

As the Ninth Circuit explained in *Craighead*, a reasonable person interrogated inside his own home "may have a different understanding of whether he is truly free 'to terminate the interrogation' if his home is crawling with law enforcement agents conducting a warrant-approved search." *Id.* at 1083. As Atencio argues, a reasonable person would also likely feel even more compelled to comply with the officers' commands to get the officers out of the home as quickly as possible in order to reduce the traumatizing effects of the situation on her minor children. Dkt. 49, at 4.

The Government also contends the fact that Atencio's five family members were present in the home provided Atencio with comfort and reassurance which reduced the degree of pressure applied during Woodward's interrogation. However, as noted, Atencio was not with her family members during the interrogation, and was instead isolated from them when Woodward took her outside to interrogate her alone. "A frequently recurring example of police domination concerns the removal of the suspect from family, friends, or

---

[6] The Government highlights that it is standard procedure to detain residents of a home for officer safety purposes during the execution of a search warrant. Dkt. 48, at 1, 4. As the Ninth Circuit explained in *Craighead*, the fact that such precautions "may be necessary to the success of the lawful search does not lessen their tendency to make a reasonable person believe he is in custody." 539 F.3d at 1086.

colleagues who might lend moral support during the questioning and deter a suspect from making inculpatory statements." *Id*. at 1087 (cleaned up).

Finally, during the interrogation, Woodward also went so far as to explicitly tell Atencio she had indeed been detained and that the only reason she had not been advised of her *Miranda* rights earlier was because no one had yet asked her any incriminating questions. Dkt. 21-7, at 1:19–1:28. As Atencio highlights, no reasonable person expressly told by an interrogating officer that she was detained would nevertheless conclude she was free to leave. Dkt. 21-1, at 12.

*vii. Conclusion*

Under the totality of the circumstances, including the manner in which the interrogation was initiated, the extent to which Woodward confronted Atencio with evidence of her guilt, the physical surroundings of the interrogation, the degree of pressure used to detain Atencio, the length of detention, and the fact that Atencio was arrested after the interrogation,[7] the Court finds a reasonable person would not feel free to terminate Woodward's interrogation. As such, Woodward was required to provide Atencio with adequate *Miranda* warnings.

b. Adequacy of *Miranda* Warnings

---

[7] The Government suggests the fact that Atencio was allowed to return to the living room after her interrogation, and was not arrested until one to two hours later, suggests she was not in custody. Dkt. 48, at 5. This contention ignores that Atencio and her family members were—as confirmed by Woodward—detained in the living room for the duration of the approximately nine-hour search. Dkt. 46, at 52:1–14. 57:1–17. That Atencio was not arrested for another one to two hours after her interrogation does not mean she was "released at the end of questioning" as the Government contends. Dkt. 48, at 4. Instead, Atencio was detained prior to, during, and after the interrogation.

While Woodward provided Atencio with *Miranda* warnings, Atencio argues such warnings were inadequate because Woodward failed to advise her that she had a right to consult with an attorney prior to and during questioning. Woodward stated the following to advise Atencio of her *Miranda* rights:

> **Woodward**: Before I talk to you about that I have to advise you of your Miranda rights. It's all part of the process, ok. Do you understand what those are?

> **Atencio**: I already know (indiscernible)

> **Woodward**: I am going to advise you of them anyway and you can decide whether you want to talk to me or not. You do have the right to remain silent. Anything you say can and will be used against you in a court of law. You have the right to an attorney. If you cannot afford an attorney, one will be appointed for you, no cost. At any given time, if you do not want to talk to me, you don't have to, or any other officer here, ok?

Dkt. 21-7, at :48–1:19.

The Government contends that because Woodward said both "[b]efore I talk to you" and "[y]ou have a right to an attorney," his *Miranda* warnings properly advised Atencio that she had a right to counsel before questioning. Dkt. 28, at 12. Although Woodward did not state Atencio had a right to an attorney during questioning, the Government argues "this is reasonably inferred by the right to an attorney's presence before questioning." *Id.* at 13 (citing *Florida v. Powell*, 559 U.S. 50, 51 (2010) ("*Powell*")).

In determining whether a police officer adequately conveyed each of the requisite *Miranda* warnings, "reviewing courts are not required to examine the words employed as if construing a will or defining the terms of an easement. The inquiry is simply whether the warnings reasonably convey to the suspect his rights as required by *Miranda*." *Powell*, 559

U.S. at 60 (cleaned up). However, it is "an absolute prerequisite to interrogation" that an individual held for questioning "must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation." *Miranda*, 384 U.S. at 471.

Here, Atencio was not advised that she had a right to an attorney before Woodward questioned her. Instead, Woodward stated he had to advise Atencio of her *Miranda* rights *before* he spoke with her about the firearm. Dkt. 21-7, at :48-1:19. That Woodward used the word "before" more than fifty words prior to advising Atencio that she had a right to an attorney does not mean that he adequately conveyed she had a right to an attorney before questioning. Further, Woodward's statement "before I talk with you" was not a part of Woodward's subsequent *Miranda* litany. Instead, Woodward's subsequent phrase, "I have to advise you of your *Miranda* rights, it's all a part of the process ok," unmistakably indicated that his recitation of the *Miranda* warnings had not yet begun when he used the word "before." *Id*.

Although every case is fact dependent, Supreme Court and Ninth Circuit cases regarding the adequacy of *Miranda* warnings with respect to the right to counsel illustrate Woodward's warnings were insufficient. For instance, in *Powell*, the Supreme Court held the defendant was adequately advised of his right to consult with counsel both before and during questioning because officers informed the defendant: (1) he had "the right to talk to a lawyer before answering any of their questions"; and (2) he had "the right to use any of his rights at any time he wanted during the interview." 559 U.S. at 62 (cleaned up). The

Supreme Court held the first statement communicated that the defendant could consult with a lawyer before answering any questions, and the second statement confirmed that the defendant could exercise this right while the interrogation was underway. *Id*. "In combination, the two warnings reasonably conveyed [defendant's] right to have an attorney present, not only at the outset of the interrogation, but at all times." *Id*. By contrast, Woodward generally informed Atencio she had a "right to an attorney," and that one would be appointed at no cost if she could not afford one, without any indication that she could exercise this right either before, or during, questioning. Dkt. 21-7, at :48-1:19.

Similarly, in *United States v. Loucious*, an officer advised the defendant: "You have the right to the presence of an attorney during questioning and if you cannot afford an attorney, one will be appointed before questioning." 847 F.3d 1146, 1148 (9th Cir. 2017). Defendant argued such warnings were deficient because they did not explain he had a right to consult with an attorney before questioning. *Id*. at 1149. The Ninth Circuit disagreed, finding the warning that if the defendant was unable to afford an attorney one would be appointed *before* questioning, and the warning that defendant had the right to the presence of an attorney *during* questioning, together reasonably conveyed that the defendant could consult with an attorney prior to and during questioning. *Id*. at 1151; *see also Snaer*, 758 F.2d at 1342 (finding warning that the defendant had the right to consult with a lawyer and to have a lawyer present while being questioned adequately provided notice of the right to consult with an attorney before questioning). Here, Woodward's general statement

regarding Atencio's right to an attorney was instead completely untethered from any temporal indication as to when she could exercise this right.

In short, the Court finds Woodward failed to adequately convey to Atencio that she had a right to consult with counsel *either* before or during the interrogation.

c.  Conclusion

Because Atencio was subjected to a custodial interrogation without first being advised of her right to consult with an attorney before and during questioning, Atencio's Motion to Suppress Statement is **GRANTED**.

**B. Motion to Suppress Fruits of Unlawful Search of Home (Dkt. 36)**

*1. Legal Standard*

The Fourth Amendment guarantees the right of individuals to be secure in "their persons, houses, papers, and effects, against all unreasonable searches and seizures." *Mapp v. Ohio*, 367 U.S. 643, 647 (1961) (cleaned up). Under Fourth Amendment jurisprudence, both the interior of individuals' homes, and the digital contents of their cell phones, are entitled to the highest protection. *See Kyllo v. United States*, 533 U.S. 27, 31 (2001) ("At the very core" of the Fourth Amendment "stands the right of a man to retreat into his own home and there be free from unreasonable governmental intrusion") (citations omitted); *Riley v. California*, 573 U.S. 373, 403 (2014) (explaining modern cell phones "hold for many Americans 'the privacies of life' [and the] fact that technology now allows an individual to carry such information in his hand does not make the information any less worthy of the protection for which the Founders fought").

Where, as here, a search is conducted pursuant to a warrant, the search is presumed to be valid. *Franks v. Delaware*, 438 U.S. 154, 171 (1978). To obtain a search warrant, the government must "establish by sworn evidence presented to a magistrate that probable cause exists to believe that an offense has been committed and that items related to that offense, such as fruits of the crime, will be found on the premises sought to be searched at the time the warrant is issued." *United States v. Rabe*, 848 F.2d 994, 997 (9th Cir. 1988) (citing *Durham v. United States*, 403 F.2d 190, 193 (9th Cir. 1968)).

When the validity of a search warrant is challenged, the duty of the reviewing court is to ensure that the magistrate judge who issued the search warrant had a substantial basis to conclude probable cause existed. *Illinois v. Gates*, 462 U.S. 213, 238–39 (1983) ("*Gates*"). The issuance of a warrant "cannot be a mere ratification of the bare conclusions of others." *Id*. at 239. However, probable cause "is not a high bar: it requires only the kind of fair probability on which reasonable and prudent people, not legal technicians, act." *Kaley v. United States*, 571 U.S. 320, 338 (2014) (cleaned up). A magistrate judge is only required to answer the "commonsense, practical question whether there is 'probable cause' to believe that contraband or evidence is located in a particular place" before issuing a warrant*. Gates*, 462 U.S. at 230. The Court must afford the magistrate judge's decision "great deference," and if the Court determines the magistrate judge had a "substantial basis" to conclude the "search would uncover evidence of wrongdoing," suppression is not warranted. *Id.* at 236.

In addition to the probable cause requirement, a search warrant must also be specific. This specificity requirement has two distinct aspects: "particularity" and "breadth." *United States v. SDI Future Health, Inc.*, 568 F.3d 684, 702 (9th Cir. 2009) (citation omitted). "Particularity is the requirement that the warrant must clearly state what is sought. Breadth deals with the requirement that the scope of the warrant be limited by the probable cause on which the warrant is based." *Id*.

The Fourth Amendment requires a search warrant to "particularly describe[] the place to be searched and the persons or things to be seized." *In re Grand Jury Subpoenas Dated Dec. 10, 1987*, 926 F.2d 847, 857 (9th Cir. 1991). A "warrant  must make clear to the executing officer exactly what it is that he or she is authorized to search for and seize." *Id*. The Ninth Circuit has described the particularity requirement as serving "foundational constitutional interests" which "must be zealously protected." *United States v. Ramirez*, 976 F.3d 946, 952 (9th Cir. 2020) ("*Ramirez*"). Particularity "prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *United States v. Cardwell*, 680 F.2d 75, 77 (9th Cir. 1982) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)).

The "concept of breadth may be defined as the requirement that there be probable cause to seize the particular thing named in the warrant." *In re Grand Jury Subpoenas*, 926 F.2d at 857. "The command to search can never include more than is covered by the showing of probable cause to search." *United States v. Whitney*, 633 F.2d 902, 907 (9th Cir. 1980) (citation omitted). Search warrants are "fundamentally offensive to the

underlying principles of the Fourth Amendment when they are so bountiful and expansive in their language that they constitute a virtual, all-encompassing dragnet of personal papers and property to be seized at the discretion of the State." *United States v. Bridges*, 344 F.3d 1010, 1016 (9th Cir. 2003).

If a search is conducted pursuant to an invalid warrant, then the evidence discovered through the "exploitation of" an illegal search or seizure must also be suppressed as "fruit of the poisonous tree." *Wong Sun v. United States*, 371 U.S. 471, 488 (1963). Evidence qualifies as "fruit of the poisonous tree" when "the illegal activity tends to significantly direct the investigation to the evidence in question." *United States v. Johns*, 891 F.2d 243, 245 (9th Cir. 1989) (cleaned up).

*2. Discussion*

Atencio argues the search warrant at issue was not supported by probable cause and did not satisfy either the particularity or the breadth requirements. As such, she contends the fruits of the officers' unlawful search of her home, including the firearm and ammunition which serve as the basis for her unlawful possession of a firearm charge, must be suppressed. The Government counters that: (1) the search warrant, read in conjunction with Richardson's affidavit, provided probable cause given Maricela's participation in the Nampa riot; (2) the warrant was sufficiently particular because it allowed for the search and seizure of only specific categories of evidence; and (3) the warrant was not overbroad because officers could not provide more detailed information regarding the evidence to be seized at the time the affidavit was executed. In the alternative, the Government argues

suppression is nevertheless unwarranted under the exclusionary rule's good faith exception. If the Court disagrees and finds the warrant lacked probable cause or specificity, the Government asks the Court to sever any invalid portions of the warrant without invalidating the entire warrant.

a. Probable Cause

Atencio first contends Richardson's affidavit did not demonstrate probable cause to believe that the evidence it targeted for seizure could be found at 611 16th Avenue North. Richardson's affidavit stated: "I believe that there is probable cause that Gabriel 'RJ' Bernal committed the crime of Felony Rioting with Felony Gang Enhancement," and that evidence of such crimes could be located at Maricela's address. Dkt. 21-2, at 2. The affidavit further noted: "Maricela was identified associating with known Northside gang members during a fight that resulted in shots being fired. During this incident, Maricela was identified as being with other documented Northside gang members," including Bernal. *Id.* at 5. The items to be seized portion of Richardson's affidavit identified evidence which would show occupancy, ownership and/or control of 611 16th Avenue North, guns and ammunition, "gang indicia," and digital evidence including "cell phones, computers, tablets, portable electronic devices, laptops, cameras, external hard drives, USB flash drives." *Id*. at 6.

Atencio argues Richardson's affidavit recited no facts to suggest that Bernal had any connection to either Maricela or to her home. Because the affidavit did not identify any nexus between 611 16th Avenue North and the criminal rioting charge against Bernal,

Atencio suggests the warrant lacked probable cause to seize evidence establishing ownership, occupancy, or control of the home. Atencio also contends the affidavit failed to provide any basis to conclude that guns or ammunition would be found in 611 16th Avenue North, as there was nothing in the affidavit to suggest Maricela used a firearm during the Nampa riot, that she kept a firearm in her home, or that she had ever even been seen in possession of a firearm. Atencio maintains there were also no facts in the affidavit to suggest Maricela was a Northside gang member. Finally, Atencio argues there was absolutely nothing in Richardson's affidavit to demonstrate probable cause to believe that any phone or other electronic device having a nexus to the alleged riot would be found in 611 16th Avenue North, or that any of the phones or electronic devices located there would have information or data on them relating to Bernal's crime.

The Government counters that Richardson's affidavit presented "overwhelming evidence that the crime of felony rioting with gang enhancement had been committed by various Northside gang members, including the Defendant's daughter Maricela." Dkt. 39, at 8. For instance, the affidavit detailed the evidence found at the scene, including shell casings and a red bandana, and summarized witness testimony regarding the Nampa riot and shooting. The Government highlights that Richardson's affidavit established Maricela had been present during, and had potentially participated in, the Nampa riot. The Government suggests the Magistrate Judge thus "had a substantial basis to conclude that the search of Maricela's residence would uncover evidence of these crimes and her involvement in the crime." *Id*. The Court generally disagrees.

Although Richardson's affidavit perhaps demonstrated probable cause to believe Maricela had participated in the crime of felony rioting with felony gang enhancement, there is a distinction between probable cause to arrest a suspect and probable cause to obtain a search warrant for a suspect's home. An arrest warrant rests on probable cause to believe that the suspect committed an offense, and thus primarily serves to protect an individual's liberty interest against an unreasonable seizure of his person. *Steagald v. United States*, 451 U.S. 204, 213 (1981). By contrast, a search warrant is "is issued upon a showing of probable cause to believe that the legitimate object of a search is located in a particular place[.]" *Id*. Rather than protect an individual's person, a search warrant "safeguards an individual's interest in the privacy of his home and possessions against the unjustified intrusion of the police." *Id*. Regardless of whether an individual is validly suspected of committing a crime, an application for a search warrant concerning her property or possessions must demonstrate "a fair probability that contraband or evidence of a crime will be found in a particular place." *Gates*, 462 U.S. at 238. Thus, to obtain a warrant "to search for and seize a suspect's possessions or property, the government *must do more than show probable cause to arrest him*." *United States v. Griffith*, 867 F.3d 1265, 1271 (D.C. Cir. 2017) (emphasis added).

With the exception of two categories of evidence, Richardson's affidavit failed to demonstrate probable cause to believe that several items it targeted for seizure would be located in 611 16th Avenue North. The Court addresses each of the "items to be seized" identified in the affidavit in turn.

*i.   Evidence of occupancy/ownership and/or control of 611 16th Avenue North*

Richardson's affidavit stated school and police department records confirmed Maricela lived at 611 16th Avenue North. Dkt. 21-2, at 6. The affidavit did not attach such school and/or police department records, and also failed to provide any date or other details to identify these unspecified materials. Despite this, the Court credits Richardson's sworn affidavit stating such records existed. Further, the affidavit connected Maricela to Bernal because both were identified as participants in the Nampa riot by the minor victim. *Id*. at 5. The Court finds the warrant established probable cause to believe 611 16th Avenue North was Maricela's residence.

*ii. Guns and ammunition*

While Richardson's affidavit detailed the fact that shots were fired during the Nampa riot, the affidavit did not contain any facts to connect Maricela to the fired shots, to indicate Maricela had ever possessed a firearm or ammunition, or to intimate that the firearm used in the shooting might be found in Maricela's residence. Nor did the affidavit provide any facts to suggest Bernal (or anyone else involved in the Nampa riot) had ever even been to 611 16th Avenue North—let alone that they kept firearms or ammunition there. The question is not whether Richardson's affidavit established that the crime of rioting with felony gang enhancement involved guns or ammunition, but rather whether the guns and ammunition could be found at 611 16th Avenue North. *United States v. Wong*, 334 F.3d 831, 836 (9th Cir. 2003) ("Probable cause exists if it would be reasonable to seek evidence in the place indicated in the affidavit."). Here there are no facts in the warrant or

affidavit to suggest it would be reasonable to find guns or ammunition at 611 16th Avenue North. To hold otherwise would be to find there is probable cause to search the home of any individual present during a shooting, regardless of how many individuals were at the scene, or whether the targeted individual played a minor, major, or any role whatsoever, in the shooting.

### iii. Gang indicia

Atencio highlights that Richardson's affidavit did not suggest Maricela was wearing any type of attire indicative of membership in either the Northside—or any other gang— either during the Nampa riot or at any other time. However, the affidavit attested that Maricela was present during the Nampa riot, that the minor victim identified Maricela as a "known Northsider[]," and that the minor victim also identified Maricela as one of the gang members who had "jumped her." Dkt. 21-2, at 3–5. As such, the Court finds there was probable cause to search Maricela's residence for gang indicia.

### iv. Digital evidence, cell phones, computers, tablets, portable electronic devices, laptops, cameras, external hard drives, USB flash drive

Most glaringly, the affidavit failed to establish probable cause to search 611 16th Avenue North for all cell phones and any other digital evidence. The affidavit did not include any facts to indicate Maricela—or any other individual present during the Nampa riot—was seen in possession of a cell phone. There are also no facts to suggest Maricela or any of the other suspects present at the Nampa riot communicated by cell phone calls or texts. The affidavit did not give any indication that Maricela even owned a cell phone. Nor did it offer even general information to suggest that gang members typically communicate

via electronic devices. While the warrant authorized officers to search for and seize all electronic devices located in her home, the affidavit offered no reason to suspect Maricela owned such devices, much less that any phone or other device found in 611 16th Avenue North would contain incriminating evidence about Bernal's crime.

The Government argues the "Magistrate Judge could reasonably infer from [Richardson's affidavit] that phone calls, texting, and other communications occurred between gang members before, during and after the incident." Dkt. 39, at 6. For example, the affidavit noted that a group of gang members "showed up" to the Nampa residence after leaving a party in Caldwell. Dkt. 21-2, at 4. After the initial altercation at the Nampa residence, the gang members left, but returned approximately 30 minutes later. *Id.* The Government argues such facts "support an inference of coordination between gang members, which coordination could have only logically been done by communicating through electronic devices such as cell phones." Dkt. 39, at 6–7. Yet, the suspects also could have simply told each other in person to reconvene at the Nampa residence, or to return to the Nampa residence, when leaving each location. There is absolutely no information in Richardson's affidavit to suggest the suspects communicated via cell phones, or by any of the other electronic devices the affidavit identified for seizure. In fact, Richardson himself did not address this inference in his affidavit.

While a "magistrate is entitled to draw reasonable inferences about where evidence is likely to be kept, based on the nature of the evidence and the type of the offense," *United States v. Angulo-Lopez*, 791 F.2d 1394, 1399 (9th Cir. 1986), the magistrate judge in this

case would have had to have made multiple inferences to find probable cause to search for cell phones and all other digital evidence at 611 16th Avenue North. First, the magistrate judge would have to infer Maricela owned/possessed a cell phone at the time of the Nampa riot. There are no facts in the affidavit to suggest this, and the Court cannot find there was probable cause to search Maricela's home for a cell phone simply because most people own one. *Griffith*, 867 F.3d at 1268 ("In our view, the fact that most people now carry a cell phone was not enough to justify an intrusive search of a place lying at the center of the Fourth Amendment's protection—a home—for any phone Griffith might own.").

Second, the magistrate judge would have to infer that Maricela owned/possessed the same cell phone when her home was searched seven weeks after the Nampa riot. However, where, as here, the "police seek permission to search a house for an item they believe is already located there, the magistrate's determination that there is probable cause for the search amounts to a prediction that the item will still be there when the warrant is executed." *United States v. Grubbs*, 547 U.S. 90, 95 (2006) (citations omitted). Richardson's affidavit provided no facts to suggest Maricela still possessed the same cell phone—if she even owned one in the first place—seven weeks after the Nampa riot.

Third, the magistrate judge would have to infer the cell phone Maricela purportedly owned during the Nampa riot was located inside 611 16th Avenue North. As the *Griffith* court explained:

> People ordinarily carry their cell phones with them wherever they go. A cell phone, after all, is nearly a 'feature of human anatomy.' According to one poll cited by the Supreme Court, 'nearly three-quarters of smart phone users report being within five feet of their phones most of the time' . . . . In that

light, the assumption that most people own a cell phone would not automatically justify an open-ended warrant to search a home anytime officers seek a person's phone. Instead, such a search would rest on [another] assumption: that the person (and his cell phone) would be home. When as here, the police execute a warrant early in the morning, such an assumption might be fair, but it entails adding another layer of inference onto an already questionable probable cause calculus.

867 F.3d at 1273 (quoting *Riley*, 573 U.S. at 385).

Like the warrant at issue in *Griffith*, here the warrant gave officers authority to search 611 16th Avenue North for any cell phones or other electronic devices without regard to Maricela's presence on the scene. *Id*. Indeed, the police, not knowing whether Maricela owned a cell phone, instead sought and obtained authority to maintain their search until they found all cell phones (and other electronic devices) in Maricela's residence, presumably so that they could later assess which (if any) belonged to Maricela. *Id.*

Finally, the magistrate judge would also have to infer that evidence pertaining to Bernal's rioting offense would be found on Maricela's cell phone, or on any other cell phone or other electronic device located in her home. This assumption would have to be made in the absence of any facts in the affidavit to establish probable cause to believe that any cell phones—including one possessed by Maricela—would contain evidence relating to the Nampa riot. Again, Richardson's affidavit does not indicate that *any* of the individuals present during the alleged riot were seen with, or used, a cell phone or any other electronic device to take photos of, or to communicate regarding, the offense.

Although "each of these inferences 'standing alone' may be reasonable . . . with each succeeding inference, the last reached is less and less likely to be true. Virtual

certainty becomes probability, which merges into possibility, which fades into chance." *United States v. Weber*, 923 F.2d 1338, 1344 (9th Cir. 1991). At best, the reasonable inference Richardson's affidavit allowed was only the hypothetical possibility that a cell phone containing incriminating information about Bernal's crime would be located in Maricela's home. The Fourth Amendment instead requires a "fair probability" that the items searched for will be found. *Rabe*, 848 F.2d at 997.

> *v. Conclusion*

The right of an individual to retreat into her own home and "there be free from unreasonable governmental intrusions stands "at the very core" of the Fourth Amendment's protections. *Silverman v. United States*, 365 U.S. 505, 511 (1961); *Craighead*, 539 F.3d at 1083 (referring to the home as "the most constitutionally protected place on earth.") And, the scope of a permissible search depends on the specific spaces in which the object of the search might be found. *Maryland v. Garrison*, 480 U.S. 79, 84–85 (1987) ("*Garrison*"). "Authorization to search of an item fitting in the palm of a hand, like a cell phone, thus can entail an intrusive inspection of all corners of a home." *Griffith*, 867 F.3d at 1272. As such, the search at issue involved an especially invasive search of an especially protected place. *Id*. As explained above, officers here sought and obtained authorization to continue their search until they found every cell phone and electronic device in 611 16th Avenue North, despite lacking any information to suggest Maricela owned such a device, or that evidence of Bernal's crime could be found on such a device if she owned one.

Put simply, there was nothing in the affidavit to establish a fair probability that guns or ammunition, or cell phones or other electronic devices containing information regarding Bernal's crime, could be found in 611 16th Avenue North.

b. Specificity

The warrant lacked probable cause to search for guns, ammunition, or cell phones or other electronic evidence. Although the Court finds there was probable cause to suggest 611 16th Avenue North was Maricela's home and to search the residence for gang indicia, the warrant is, in its entirety, invalid for an additional reason: its lack of particularity.[8]

*1. Particularity*

The particularity requirement "ensures that the search will be carefully tailored to its justifications, and will not take on the character of the wide-ranging exploratory searches the Framers intended to prohibit." *Garrison*, 480 U.S. at 84. "The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant." *Stanford v. Texas*, 379 U.S. 476, 486 (1965) (quoting *Marron v. United States*, 275 U.S. 192, 196 (1927)). Additionally, the particularity requirement "assures the individual whose property is searched or seized of the lawful authority of the executing

---

[8] Because the Court finds the warrant lacked probable cause and particularity, it declines to address Atencio's overbreadth argument.

officer, his need to search, and the limits of his power to search." *Groh* v. Ramirez, 540

U.S. 551, 561 (2004).

"Warrants which describe generic categories of items are not necessarily invalid if

a more precise description of the items subject to seizure is not possible." *United States v.*

*Spilotro*, 800 F.2d 959, 963 (9th Cir. 1986). When determining whether a warrant is

sufficiently precise, a reviewing court should consider: (1) whether probable cause exists

to seize all items of a particular type described in the warrant; (2) whether the warrant sets

out objective standards by which executing officers can differentiate items subject to

seizure from those which are not; and (3) whether the government was able to describe the

items more particularly in light of the information available to it at the time the warrant

was issued. *Id*. (citations omitted). In assessing the aforementioned criteria, the Court finds

the warrant at issue lacked particularity.

As explained above, the warrant (and supporting affidavit) lacked probable cause to

search for guns, ammunition, cell phones, and all other electronic devices. Although the

Court finds there was probable cause to search for evidence of home occupancy and gang

indicia, the warrant did not set out objective standards by which executing officers could

differentiate between items subject to seizure from those that were not. For instance, the

warrant allowed for seizure of evidence "which would show occupancy, ownership and/or

control of 611 16th Ave N." Dkt. 26-3. The warrant did not provide *any* description of such

evidence. Under this broad category, officers could presumably search for any bills, deeds,

insurance policies, mail, photographs, communications, clothing or other items belonging

to Maricela, or any other unspecified evidence in the home. Moreover, given that Maricela was a minor, it was unlikely that any documentation would evidence that Maricela lived in the home. Nevertheless, the warrant essentially gave the officers a license to potentially search and seize any and all papers belonging to Maricela's parents—neither of whom was a suspect in the Nampa riot. The warrant clearly could have identified a relevant subset of documents or other evidence rather than leaving unfettered discretion to the searching officers.

The warrant also allowed seizure of "gang indicia, including but not limited to clothing and items containing gang writings/depictions." Dkt. 21-3, at 1. The warrant did not provide a definition of gang clothing or "gang writings/depictions." *Id*. Given this vague description, officers seized various items related to the Dallas Cowboys, including a headband, hat, jersey, and insulated bag. Dkt. 36-6. Officers also seized items related to the New York Yankees, including a "Yankees dark blue hat case w/ black on black Yankees hat." *Id*. at 8. As Atencio highlights, the colors for the Dallas Cowboys are blue, metallic silver, royal blue, and white. Dkt. 36-1, at 23. The colors for the New York Yankees are navy blue, gray, and white. *Id*. at 24. Yet, as indicated by Richardson in his affidavit, the Northside gang uses the color red to signify affiliation, and a red bandana was located at the scene of the Nampa riot. Dkt. 21-2, at 3. As such, the affidavit could have described the items more particularly given the information available to Richardson at the time. For instance, the warrant could have sought gang indicia associated with the Northside gang—the only gang identified to have been involved in the Nampa riot—such as red bandanas or

other specific indicia of the Northside gang. Richardson made no attempt to specify the type of "gang indicia" likely to be found at 611 16th Avenue North.

Most egregiously, the warrant broadly authorized officers to seize all "digital evidence, cell phones, computers, tablets, portable electronic devices, laptops, cameras, external hard drives, [and] USB flash devices" located in 611 16th Avenue North. Dkt. 21-3, at 1. The warrant did not limit such seizure to electronic devices belonging to Maricela, but instead allowed seizure of all cell phones and electronic devices found in 611 16th Avenue North. Given this limitless discretion, officers apparently seized every electronic device in the home, including approximately fifteen cell phones, a laptop, a Sony camera, and at least one tablet. Dkt. 36-6. The warrant could have more particularly devices to be seized by seeking authorization to seize Maricela's cell phone or other electronic devices belonging to Maricela. After all, Maricela was the *only* resident of Atencio's home suspected of participating in Bernal's crime. Yet, neither the warrant nor Richardson's affidavit limited the search for cell phones and electronic devices in any way.[9]

Notably, upon initiating his search, Woodward was able to immediately identify Maricela's bedroom, to locate her cell phone and charging block, and to seize both items. Dkt. 36-5, at 1. Nevertheless, the lack of particularity in the warrant allowed officers to also seize approximately fifteen additional cellphones, a tablet, and a Sony camera

---

[9] Moreover, as explained above, the warrant and affidavit lacked probable cause to search for even a cell phone or other electronic devices belonging to Maricela.

belonging to the other residents of the home, none of whom were suspected of being involved in Bernal's crime.

The warrant also allowed officers to forensically search each of the seventeen electronic devices found in 611 16th Avenue North. Forensic examinations of electronic devices are more comprehensive and intrusive than manual searches, and thus deserve greater protection under the Fourth Amendment. *United States v. Cotterman*, 709 F.3d 952, 962–65 (9th Cir. 2013) (describing forensic examinations as essentially a "computer strip search" that are more intrusive than manual searches and requiring reasonable suspicion to conduct at border crossings). Here the warrant contained no scope limitations as to the devices that could be seized or the digital evidence which could be searched. The warrant did not contain any temporal or content limitation on the data to be searched, and did not require any connection between the seized device and Maricela. The warrant did not even require that the forensic searches of seized devices stop in the event that officers discovered the device did not belong to Maricela. Indeed, even if the police conclusively discovered a cell phone was not connected to Maricela, the warrant authorized the police to freely review every message, email, snapchat, communication, bank account record, credit card statement, GPS location, accessed website, and photograph located on the phone.

As the Supreme Court held in *Riley*, to allow the police this type of unguided review of the entire contents of a cell phone when executing a search warrant would authorize the exact type of general warrant that the Fourth Amendment forbids. 573 U.S. at 397 ("Indeed, a cell phone search would typically expose to the government far *more* than the most

exhaustive search of a house: A phone not only contains in digital form many sensitive records previously found in the home; it contains a broad array of private information never found in a home in any form—unless a phone is") (emphasis in original).

Here, the officers located Maricela's phone and then nevertheless seized and forensically searched multiple additional cell phones and other electronic devices. Eighteen months later, such devices had not been returned to Maricela or her family. Dkt. 46, at 94:1–25.

   *2. Conclusion*

The Fourth Amendment's particularity requirement "is not a mere technicality: it is an express constitutional command." *Ramirez*, 976 F.3d at 951. Warrants reciting generic classifications without more usually do not give the officers who execute them guidance to determine what items to seize. *United States v. Cardwell*, 680 F.2d 75, 78 (9th Cir. 1982). "[G]eneric classifications in a warrant are acceptable only when a more precise description is not possible." *Id*. (quoting *United States v. Bright*, 630 F.2d 804, 812 (5th Cir.1980)). As explained above, more precise description was possible based on the information known to Richardson at the time he executed his affidavit. Thus, the generic classifications with respect to evidence of home ownership/occupancy, gang indicia, and all cell phones and other electronic devices violated the Fourth Amendment.

  c. <u>Good Faith Exception</u>

When a warrant lacks probable cause or particularity, evidence obtained during execution of the warrant should generally be suppressed under the exclusionary rule.

*United States v. Underwood*, 725 F.3d 1078, 1084 (9th Cir. 2013) (citing *Mapp*, 367 U.S. at 655)); *United States v. Sears*, 411 F.3d 1124, 1129 (9th Cir. 2005) (explaining total suppression is a remedy in cases "involving warrants with serious particularity defects"). However, the Government argues that even if the Court finds the warrant in this case was deficient in some respect, it should nevertheless apply the good faith exception set forth in *United States v. Leon*, 468 U.S. 897, 916 (1984).

Under the good faith exception, evidence seized under a subsequently invalidated search warrant is admissible if the officers conducting the search acted "in objectively reasonable reliance on the warrant." *Underwood*, 725 F.3d at 1085 (quoting *Leon*, 468 U.S. at 922). The *Leon* Court adopted the good faith exception upon concluding police officers cannot be deterred from obtaining or executing an unconstitutional search warrant when they reasonably relied upon a magistrate's probable cause determination. 468 U.S. at 922. Where there is no improper conduct which can be deterred, the Supreme Court concluded there is no remedial function for the exclusionary rule to serve. *Id.*

However, the good faith exception is not available if an officer relies "on a warrant based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable." *Leon*, 468 U.S. at 923 (citations omitted). Nor is the good faith exception available "where the warrant is so facially deficient—i.e. in failing to particularize the place to be searched or things to be seized—that the executing officers cannot reasonably presume it to be valid." *Id*. The government bears the burden of demonstrating the applicability of the good faith exception. *Underwood*, 725 F.3d at 1085.

The Government argues Richardson's affidavit was not the type of "bare bones" affidavit for which the good faith exception would not apply. Dkt. 39, at 13. The Government suggests "[a]t worse, the affidavit fell within the realm in which 'reasonable minds . . . may differ on the question whether a particular affidavit establish[ed] probable cause." *Id*. (quoting *Leon*, 468 U.S. at 915). As such, the Government contends the officers "manifested objective good faith" by relying on the warrant they had obtained from the magistrate judge. *Id*. (quoting *Leon*, 468 U.S. at 924). Again, the Court disagrees.

In addition to the lack of particularity in either the warrant or Richardson's affidavit, here Richardson used the same affidavit interchangeably to obtain search warrants for eight different locations. Dkt. 36-3. As noted, a search warrant is grounded in probable cause to believe that the legitimate object of a search "is located in a particular place." *Gates*, 462 U.S. at 246.  Richardson's affidavit made no attempt to suggest evidence of Bernal's crime could be found in 611 16th Avenue North, or in any of the homes (other than Bernal's) for which Richardson obtained a search warrant using the same affidavit. As the *Leon* Court made clear, "[i]t is necessary to consider the objective reasonableness, not only of the officers who eventually executed a warrant, but also of the officers who originally obtained it or who provided information material to the probable cause determination." 468 U.S. at 923 n. 24. Further, a reasonable officer executing a warrant "would know that probable cause is not supplied where," as here, "the mass of facts" contained in the affidavit "simply does not plausibly connect the place to be searched to the item sought." *United States v. Grant*, 682 F.3d 827, 841 (9th Cir. 2012).

In addition, there is no evidence in the record to suggest Woodward—the lead investigator in this case—or any of the other officers who executed the warrant, relied upon Richardson's affidavit.[10] Dkt. 46, at 31:3–6. Woodward testified that when he executed the warrant, he "did not know the particulars" of the Nampa riot. *Id.* at 38:17–19. While Woodward explained he briefly read Richardson's affidavit prior to serving the warrant, he could not remember which parts of the affidavit he had reviewed. *Id.* at 39:2–6. When questioned whether he had sufficiently reviewed the affidavit, Woodward again confirmed, "I did not know the particulars." *Id*. at 39:7–14. Woodward did not bring the affidavit with him to the search. *Id*. at 45:9–10. He could not say whether the affidavit contained any information to suggest Maricela wore gang attire during the Nampa riot, whether Maricela owned a cell phone, whether Maricela had ever met Bernal, or whether Bernal had ever been to Maricela's home. *Id*. at 67:20–68:20. Woodward also couldn't recall what evidence the warrant authorized the officers to search for and seize. *Id*. at 65:15–25. In fact, Woodward testified that the warrant did not authorize the seizure of electronic devices, and that he did not seize any cell phones, until confronted with his report, which showed that he had seized both. *Id*. at 66:1–17.

The good faith exception "requires a sincerely held and objectively reasonable belief that the warrant is based on a valid application of the law to all known facts. Good faith is

---

[10] Woodward was the Government's only witness at the evidentiary hearing, and there are no affidavits or police records before the Court to suggest officers relied upon the search warrant or Richardson's affidavit. As such, the Government has not met its burden of establishing the applicability of the good faith exception. *Underwood*, 725 F.3d at 1085.

not a blanket excuse for any police behavior." *United States v. Reilly*, 76 F.3d 1271, 1273 (2d Cir. 1996). Here the evidence suggests the officers who executed the search warrant did not review Richardson's affidavit, and consequently they cannot claim they acted in good faith. Even if they had reviewed it, the affidavit was, as explained above, so lacking in probable cause and particularity that the good faith exception does not apply. *Leon*, 468 U.S. at 923.

    d.  <u>Severability</u>

Finally, if the Court concludes, as it has, that the warrant was unsupported by probable cause, the Government requests that the Court should nevertheless strike the invalid portions of the warrant, uphold the valid portions, and sustain seizures pursuant to the latter. Dkt. 48, at 9 (citing *Spilotro*, 800 F.2d at 967). While "[p]artial suppression is an acceptable middle ground between suppressing or admitting all evidence," here the Court finds the warrant lacked probable cause to search 611 16th Avenue North for guns and ammunition or for cell phones or other electronic devices. *Spilotro*, 800 F.2d at 967. It also lacked the requisite particularity with respect to gang indicia, evidence of home ownership/occupancy, and cell phones and other electronic devices. As such, the Court cannot sever any portions of the warrant.

## IV. CONCLUSION

For the foregoing reasons, both Motions to Suppress are granted. Atencio's confession will be suppressed because she was subjected to a custodial interrogation without adequate *Miranda* warnings. Because the warrant was not supported by probable

cause for much of the evidence it sought, and because the remaining categories of evidence were not defined with requisite particularity, the firearm and ammunition will also be suppressed as the fruits of the unlawful search.[11]

## V. ORDER

1. The Motion to Suppress Statement (Dkt. 21) is **GRANTED**;

2. The Motion to Suppress Fruits of Unlawful Search (Dkt. 36) is **GRANTED**.

3. The Government shall notify the Nampa Police Department that all evidence seized in the search of the home at 611 16th Avenue North, Nampa, Idaho should be returned to the occupants of that home within seven (7) days of the date of this Decision and Order.

DATED: April 29, 2022

David C. Nye
Chief U.S. District Court Judge

---

[11] The Government did not address Atencio's fruits argument and the Court finds the firearm was a fruit of the invalid warrant.